UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

_____
                                                    )
In Re:                                              )        Chapter 11
                                                    )
Haven Eldercare, LLC, *et al.*[1]                   )        **Jointly Administered under**
                                                    )        **CASE NO. 07-32720 (ASD)**
            Debtors.                                )
_____)            Doc. I.D. Nos. 1119, 1120, 1121


_____

        [1] Haven Eldercare, Case No. 07-32720, Waterford Equities, LLC, Case No. 07-32719, Haven Health Care Center of Windham, LLC, Case No. 07-32721, Haven Healthcare Management, LLC, Case No. 07-32722, Haven Health Center of Cromwell, LLC, Case No. 07-32723, Haven Health Center of Rocky Hill, LLC, Case No. 07-32724, Haven Health Center of Danielson, LLC, Case No. 07-32725,
Haven Health Center of Litchfield Hills, LLC, Case No. 07-32726, Haven Health Center of East Hartford, LLC, Case No.  07-32727, Haven Health Center of Jewett City, LLC, Case No.  07-32728, Haven Health Center Soundview, LLC, Case No.  07-32729, Haven Health Center of New Haven, LLC, Case No. 07-32730, Haven Health Center of West Hartford, LLC, Case No. 07-32731, Haven Health Center of Farmington, LLC, Case No. 07-32732, Haven Health Center of Norwich, LLC, Case No. 07-32733, Haven Health Center of Waterbury, LLC, Case No. 07-32734, Haven Health Center of South Windsor, LLC, Case No. 07-32735, Haven Health Center of Waterford, LLC, Case No. 07-32736, Haven Health Center of Rutland, LLC, Case No. 07-32740, Lighthouse Medical Supply, LLC, Case No. 07-32741, Haven Health Center of St. Albans, LLC, Case No. 07-32742, Haven Health Care Trust II, LLC, Case No. 07-32743, Cromwell Crest Convalescent Home, Inc., Case No. 07-32744, Applegate Lane, Inc., Case No. 07-32745, Haven Health Center of Claremont, LLC, Case No. 07-32746, Litchfield Health Care Trust, LLC, Case No. 07-32747, Haven Health Care Center of Warren, LLC, Case No. 07-32748, Ferretti's Nursing Home, Inc., Case No. 07-32749, Haven Equities of Warren, Rhode Island, LLC, Case No. 07-32750, Haven Health Center of Pawtucket, LLC, Case No. 07-32751, Pawtucket Equities, LLC, Case No. 07-32752, Haven Health Center of Derry, LLC, Case No. 07-32753, Haven Health Center of Greenville, LLC, Case No. 07-32754, Haven Eldercare of New Hampshire, LLC, Case No. 07-32755, Haven Eldercare II, LLC, Case No. 07-32756, Greenville Equities, LLC, Case No. 07-32757, Hampton Equities, LLC, Case No. 07-32758, Haven Health Center at Seacoast, LLC, Case No. 07-32759, Haven Health Care of Coventry, LLC, Case No. 07-32760, Chelsea Equities, LLC, Case No.  07-32761, Coventry Equities, LLC, Case No. 07-32762, Haven Health Center of Chelsea, LLC, Case No. 07-32763, Haven Eldercare of New England, LLC, Case No. 07-32870, Haven Health Center Common Paymaster, LLC, Case No. 07-32873, Haven Eldercare of Connecticut, LLC, Case No. 07-32962, Waterbury Equities, LLC, Case No. 08-30134.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTIONS TO
SELL ASSETS AND FOR RELATED RELIEF**

The above-captioned matters came before the Court for hearing on an expedited basis on July 1, 2008 (the "Transfer Hearing"). Upon the record as a whole, including (i) the testimonial and documentary evidence received at the Transfer Hearing; (ii) matters not contested between the parties in interest; and (iii) the files and records of these jointly-administered cases, of which the Court takes judicial notice, the Court enters the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1. On November 20 and 21, 2007, December 3 and 14, 2007, and January 14, 2008 (the "Petition Dates"), the Debtors commenced the above-captioned bankruptcy cases by filing separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors operate twenty-five (25) skilled nursing, assisted living and residential care facilities in five states.

4. Pursuant to Orders of the Court dated November 27, 2007, December 5, 2007, and January 3 and 24, 2008, these cases are being jointly administered. These cases have not been substantively consolidated.

5. On November 30, 2007, an Official Committee of Unsecured Creditors (the "Committee") was appointed by the United States Trustee.

2

6.  On December 1, 2007, a Patient Care Ombudsman was appointed by the United States Trustee.

7.  Early in these cases the principal private parties-in-interest – including the Debtors, the principal secured creditors, and the Committee – agreed that the "reorganization" of the Debtors should occur through the sale of substantially all of the assets of the Debtors, preferably on a consolidated basis to a single buyer.

8.  These parties also appear to have agreed that the sale should occur through the mechanism of an independent motion pursuant to Section 363, and not as a component of a Chapter 11 plan of reorganization.

9.  On February 13, 2008, the Court entered an order (the "DIP Financing Order") approving a *Post-Petition Revolving Credit and Security Agreement* (the "DIP Loan Agreement") with CapitalSource Finance, LLC, as administrative agent for, *inter alia*, Omega Asset (CT) DIP, LLC, CapitalSource CF LLC (the "DIP Lenders").

10.  The DIP Loan Agreement required, *inter alia*, that the Debtors (i) obtain an order establishing sale procedures by April 1, 2008, (ii) obtain an order authorizing the sale of substantially all of their assets by May 30, 2008; and (iii) close the subject sale transaction by June 28, 2008.

11.  The sale process was directed by the Debtors' retained investment banking firm, Houlihan Lokey ("Houlihan").

12.  Houlihan contacted more than 100 potential purchasers for the Debtors' assets. Of those, approximately 60 entities requested more information and signed confidentiality agreements.  By February 25, 2008, the Debtors had received expressions of interest from approximately six prospective buyers.  Two such buyers emerged as the most likely

3

prospects:  LifeHouse Retirement Properties, Inc. ("LifeHouse") and FC/SCH Acquisition

Partners, LLC ("Formation").

13.  On April 10, 2008, the Court entered an Amended Order (Doc. I.D. No. 764) (the

"Auction Procedures Order"), scheduling an auction of the Debtors' assets and approving

auction procedures (the "Auction Procedures"). The Auction Procedures Order provided

that an Auction of substantially all of the Debtors' aggregated assets (the "Auction")

commence on May 14, 2008, subject to the Debtors' right to adjourn to a later date after

consultation with the Committee, *inter alia*. (Auction Procedures Order, ¶ 2).

14.  The Auction Procedures required the submission of "Qualified Bids" by a bid

deadline.  Auction Procedures ¶ C.  Each Qualified Bid was required to be for all or

substantially all of the Debtors' assets.  Auction Procedures ¶ C(d).  If more than one

Qualified Bid was received by the Bid Deadline, the Auction would take place. Auction

Procedures ¶ D.

15.  Subsequent to the entry of the Auction Procedures Order, the Debtors entered

into a proposed Asset Purchase Agreement ("APA") with LifeHouse to purchase

substantially all of the Debtors' assets for approximately $105 million.  The Debtors then

moved for approval of a break-up free and expense reimbursement to LifeHouse as its

"stalking-horse" bidder.

16.  On May 6, 2008, the Court entered a second auction procedures order (Doc.

I.D. 876) (the "Supplemental Procedures Order," and together with the Auction Procedures

Order, the "Procedures Orders"), approving a break-up fee and expense reimbursement

for LifeHouse and approving supplemental auction procedures (the "Supplemental

Procedures").  Paragraph 4 of the Supplemental Procedures Order authorized the Debtors,

4

after consultation with the Committee, to extend, continue or adjourn the Auction, but no later than May 23, 2008.  Paragraph 5 of the Supplemental Auction Procedures required the opening bid at the Auction to be not less than $109 million.

17. On May 19, 2008, LifeHouse notified the Debtors that it was exercising its right to terminate the APA, and thereafter ceased to be an active competitor for the Debtors' assets. On May 19, 2008, the Debtors served notice extending the deadline to submit a Qualified Bid to May 21, 2008, and adjourning the Auction to May 22, 2008. No Qualified Bids were received by May 21, 2008, and on May 22, 2008, the Auction was adjourned with no sale having been concluded.

18. On June 9, 2008, the Debtors served notice by which they purported to reconvene the Auction on three days' notice.

19. On June 11, 2008, the Debtors signed an APA with Formation for the sale of substantially all of the Debtors' assets for approximately $85 million (the "Formation APA").

20. Not later than June 11, 2008, the Debtors were in default under the DIP Loan Agreement. However, on June 12, 2008, a First Amendment to the DIP Loan Agreement was approved by this Court (the "DIP Financing Amendment").

21. The DIP Financing Amendment required entry of a sale order by June 27, 2008.

22. The Debtors convened an "auction" on June 12, 2008, and agreed "to accept any bids of any nature." At that event (the "June 12 Auction"), Formation announced that it had entered into the APA, which was "more or less outside of the auction process."

23. Also at the time of the June 12 Auction, the Debtors purported to accept credit bids from CapitalSource Finance, LLC or its designee and Capital Source CF LLC, as agent (collectively, "CapSource"); OHI Asset (CT) Lender, LLC ("OHI"); and Nationwide Health Properties, Inc. ("Nationwide") (collectively, the "Credit Bidders"). None of the Credit Bidders' bids were for substantially all of the Debtors' assets, nor did any of them submit bids with an aggregate value of $109 million or more.

6

24. On June 20, 2008, the Debtors filed a motion to approve the Formation APA.

25. On June 25, Formation terminated the APA.

26. There is no reasonable prospect that the Debtors can locate another prospective purchaser of substantially all of their assets for a cash price at or near $85 million.

27. The DIP Lenders are not obligated to provide further funding of the Debtors' operations, and apparently have elected to terminate all funding as of July 3, 2008. The Debtors claim to have no other sources of cash sufficient to continue the operation of their nursing facilities.

28. The matters *sub judice* concern the Debtors' efforts to respond to the dire consequences flowing from the loss of the Formation sale opportunity and the Debtors' lack of liquidity. Toward that end, with the consent and cooperation of the State of Connecticut (the "State") and certain entities with interests in the Debtors' assets (the "Proposed Transferees") the Debtors seek to sell and/or otherwise transfer or transition a large portion of their nursing facility assets and business operations to the Proposed Transferees, and permit the State to establish receiverships for several additional nursing facilities.

29. On June 27, 2008, the Debtors filed the following motions, initiating the present contested matters:

> *Emergency Motion Authorizing the Debtors to (I) Sell Certain of their Facilities Pursuant to Credit Bids Free and Clear; (II) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Approving the Settlement and Compromise of Claims* (Docket No. 1119) (the "Sale Motion");

*Emergency Motion to Approve Transition Agreement with Continuing Care of South Windsor, Inc.* (Docket No. 1120) (the "Transition Motion"); and

*Emergency Motion for Order Authorizing State Takeover of Certain Nursing Home Facilities* (Doc. I.D. No. 1121) (the "Takeover Motion")

(collectively, the "Transfer Motions").

30.  Notice of the Transfer Motions was given on June 27, 2008, to the parties listed in the Master Service List as set forth in this Court's Order Establishing Noticing Procedures entered on December 3, 2007. The majority of the parties on the Master Service List received immediate electronic service of the Transfer Motions.

31.  The Committee filed a timely Objection to the Transfer Motions, and vigorously prosecuted that Objection at the Transfer Hearing.

32.  The Sale Motion proposes to sell substantially all of the assets of certain of the Debtors to certain of those Debtors' secured creditors upon their exercise of credit bids (the "Proposed Credit Bid Sales").  With respect to the Proposed Credit Bid Sales, the Debtors have negotiated modifications to the credit bids received at the time of the June 12 Auction, to wit:

(a)  a credit bid from OHI of approximately $61.75 million, for all of the Debtors' interests in all of the real and personal property at the following seven facilities:

> Haven Health Center of Chelsea
> Haven Health Center of Coventry
> Haven Health Center of Greenville
> Haven Health Center of Pawtucket
> Haven Health Center of Warren
> Haven Health Center Seacoast
> Partridge House

(b) a credit bid from OHI of approximately $10,000, for all of the Debtors' interests in all of the real and personal property at the following eight facilities:

> Haven Health Center of Soundview
> Haven Health Center of New Haven
> Haven Health Center of Jewett City
> Haven Health Center West Hartford
> Haven Health Center of Rocky Hill
> Haven Health Center of Rutland
> Haven Health Center of St. Albans
> Haven Health Center of Claremont

(c) a credit bid from CapSource of approximately $86,248,082, for all of the Debtors' accounts receivable plus Debtors' interests in all of the real and personal property at the following four facilities:

> Haven Health Center Cromwell
> Haven Health Center of East Hartford
> Haven Health Center of Waterbury
> Haven Health Center of Derry

(d) a credit bid from Nationwide of $7.25 million and a waiver of all other claims it may have against the Debtors, for all of the Debtors' interests in all of the real and personal property at the following facility:

> Haven Health Center of Litchfield Hills

33.    The Credit Bidders are bidding the entire amount of their claims that secured by the asset they propose to purchase.

34.    The Credit Bidders have each demonstrated adequate assurance of future performance with regard to the executory contracts and/or unexpired leases that the Debtors propose to assume and assign to them (the "Executory Contracts" and "Unexpired Leases"). The Credit Bidders will be responsible for the payment of any cure costs

9

associated with the assumption of the Executory Contracts and Unexpired Leases.

35.  The Credit Bidders have each demonstrated that they will maintain the Debtors' Personal Information Policies regarding patient care privacy or will implement polices that are consistent with such Personal Information Policies.

36.  Through the Transition Motion the Debtors seek relief with respect to the assets of the Debtor, Haven Health Center of South Windsor.  Toward that end, the Debtors propose, *inter alia* (i) to surrender possession of the premises of the South Windsor facility to the owner of such real estate, Continuing Care of South Windsor ("CCSW"); (ii) to sell the personal property of the South Windsor Facility to CCSW; and (iii) to assume and assign its Medicare contract for the South Windsor facility to Connecticut Health Facilities, Inc., the proposed new operator of the South Windsor facility.

37.  With regard to the Takeover Motion, the Debtors seeks a modification of the automatic stay of Section 362(a) in favor of the State to permit the State, through its Department of Social Services ("DSS"), to take the necessary steps under applicable law to place the subject nursing facilities into receivership.  The record, however, is unclear as to what, if any, additional relief is presently sought with respect to the State.

38.  Following the consummation of the transfers contemplated by the Transfer Motions, the management company debtor will continue to generate revenue and operate pursuant to a reimbursement agreement with one of the Credit Bidders, OHI. The reimbursement arrangement is for an indefinite period of time.

39.  It is likely that if the Transfer Motions are approved and the transactions contemplated by them consummated, there will be insufficient funds in these bankruptcy estates to pay administrative and priority claims in full, or make any distribution to general

unsecured creditors.

40.  At the Hearing, the Debtors presented no formal appraisals or valuations of the aggregate or individual estate value of the Debtors' assets; nor did the Debtors present an analysis of the impact of the proposed sale of each individual facility to the particular bankruptcy estate owning such facility.

41.  The evidence established that the patient census, and revenues, at each of the Debtors' nursing facilities has declined during the course of these cases, and would likely continue to decline absent approval of the Transfer Motions.

## CONCLUSIONS OF LAW

**Jurisdiction.**

1.  The United States District Court for the District of Connecticut has jurisdiction over the instant matters by virtue of 28 U.S.C. § 1334(b).  This Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1) and the District Court's General Order of Reference dated September 21, 1984.  This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(N), (O), *inter alia*.

**Sufficiency of Notice.**

2.  The Court previously scheduled the Transfer Hearing on two days' notice, but without prejudice to the right of any party to appear and argue that in fact the period of notice was insufficient under the circumstances.  The Court construes the Committee's Objection and Transfer Hearing presentation to encompass such an argument.

3.  Bankruptcy Rule 2002(a)(2) expressly provides that the 20-day notice period for the use, sale or lease of estate property, may be shortened for cause shown.

4.  The Court is, of course, fully cognizant that under anything other than the most extraordinary circumstances, two business days' notice alone would not be an appropriate or permissible period of notice for matters as weighty as the Transfer Motions. Nonetheless, the Court determines that cause exists for shortening the notice given for the Transfer Motions.  Under the unique and extraordinary circumstances now attending these cases, the notice provided for the Transfer Motions is fair and reasonable.  The Debtors are in financial extremis and are facing the inability to operate their businesses as of July 7, 2008. Further, the Debtors have been engaged in an active, ongoing sale process and all parties-in-interest have received notice of the Debtors' efforts to sell substantially all of their assets pursuant to Section 363 since February 13, 2008 – the date of entry of the DIP Financing Order (approving the DIP Loan Agreement).

5.  The two business days' notice of the Transfer Motions must be viewed in the broader light of the prolonged cash sale effort, and the history of participation of interested parties in these cases.  From shortly after the Petition Date, the Debtors, with the support and/or participation of all case constituents, including the Committee, have been continuously engaged in aggressive efforts to sell substantially all of their assets pursuant to Section 363.  Unexpectedly, the parties' collective and sustained optimism that the auction process would produce a sufficient cash purchaser has proven unjustified.  In essence, the present Transfer Motions are simply an inevitable extension of the Debtors' uninterrupted efforts to bring a sufficient cash buyer into the auction process, with a changeover to credit bidding, and receiverships, as an unavoidable consequence of that

12

failed effort.  Although unfortunate, this changeover was early envisioned, and clearly

foreseeable.

6.   There is no credible evidence to support a claim that additional notice might

materially enhance the outcome for any case constituency.  To the contrary, the evidence

of the extensive sales process, failed offers, and present absence of interest from any cash

bidders suggests the opposite.  In light of the continued deterioration of the value of the

Debtors assets, and the track record of marketing to date, there is no support for a finding

that more time and/or any different sale process would generate a buyer willing to pay a

higher price, or otherwise provide more value.

**Statutory Predicates.**

7.   The statutory predicates for the relief sought in the Transfer Motions are

Bankruptcy Code Sections 105, 362, 363 and 365 and Bankruptcy Rules 2002, 6004, 9014

and 9019.

**The Sale Motion.**

8.   The credit bids underlying the Sale Motion can not derive from or relate to the

auction process that the Debtors purport to have engaged on June 12, 2008.  The credit

bids purportedly made at that time violated the extant Auction Procedures in that they, *inter*

*alia*, were not for substantially all of the assets of the Debtors.

9.  The Court's consideration of the Sale Motion is as a motion to sell assets under

Section 363 in consideration of credit bids authorized and made pursuant to Section 363(k),

unrelated to any prior auction sale agreements or procedures.

13

10.  Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  A debtor-in-possession is given these rights by Section 1107(a).

11.  In general, a sale of substantially all of the assets of a Chapter 11 debtor should be pursued in the context of the process for the proposal and confirmation of a plan of reorganization.  See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983). Nonetheless, Courts have consistently held that approval of a proposed sale of property pursuant to Section 363(b) is appropriate if the record reveals a "good business reason" for approval of the proposed sale outside the procedure of Chapter 11 plan proposal and confirmation.  See Lionel, 722 F.2d at 1071; accord Stephens Industries Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting Lionel's holding that a "bankruptcy court can authorize a sale of all of a Chapter 11 debtor's assets under Section 363(b)(1) when a sound business purpose dictates such action"); In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (affirming the judgment of courts below that a Section 363(b) sale prior to a plan was appropriate because "good business reasons" exist for such sale).

12.  In the present cases, sound business reasons exist to sell the Debtors' assets under Section 363.  The Debtors will have no material source of funds as of July 7, 2008. In the real Debtors' world this translates to, *inter alia*, no payroll, food, medicine, or medical supplies. The proposed transfers are the only means available which will insure an orderly transfer of the assets, terminate further economic deterioration, and ensure the continued comfort, care, and even the lives, of several thousand vulnerable patients.  At this time, under the present circumstances, any other action runs an unreasonable risk that patient

14

care would suffer.  That risk is unacceptable to the Court.

13.  None of the parties suggests a Chapter 11 Plan as a viable alternative to the sale procedure proposed by the Debtor.  The Committee's proposed alternative is abandonment of the assets.  In a case with different circumstances, abandonment might well be an equal or superior option for the ultimate disposition of estate assets.  However, as noted in the immediately preceding Conclusion, such an alternative bears the unacceptable risk of injecting an element of chaos into the transition of these nursing home facilities, thereby jeopardizing patient care.

14.  The credit bids "price" are fair on their face, and no party has argued otherwise.

15.  There is no requirement that a sale of assets yield a recovery to unsecured creditors when none is feasible.

16.  In accordance with Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property under Section 363(b) "free and clear of any interest in such property of an entity other than the estate" only if one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (2007).

17.  There have been no objections filed or presented by holders, if any, of interests

15

in the property that is subject to sale under the Transfer Motions.  Therefore, sale of such

property free and clear of interests is appropriate by consent pursuant to Section 363(f)(2).

**Individualized Assessments.**

18.   The Court notes that these jointly-administered cases are not substantively

consolidated.  Under different circumstances, that fact would compel the Debtor to provide

individualized assessments of the value of the subject assets and claims associated with

individual bankruptcy estates.

19.   The Debtor and the Credit Bidders suggest that an individualized assessment

is not necessary here because, *inter alia*, the record demonstrates that the claims of the

Credit Bidders blanket multiple properties, and that no individual estate has a continuing

viability in light of the DIP Lenders' stated intent not to continue to fund the operations of

the Debtors.

20.   The Committee has not provided specific, countervailing legal authority to the

arguments of the Debtors regarding the necessity of individualized estate assessments.

At most, the Committee has posited that given sufficient time a creative attorney might

develop a legal theory justifying individualized assessment.   The Court will not so

speculate.

**The Transition Motion.**

21.   The Transition Motion represents a prudent, sensible, and beneficial outcome

for the South Windsor and Farmington estates, and will be approved by this Court as

requested.

**The Takeover Motion.**

16

22.    As noted at ¶ 37 of the Findings of Fact, it is unclear if the Debtors presently seek relief beyond an order granting a modification of the automatic stay of Section 362(a) in favor of the State to permit it, through DSS, to take the necessary steps under applicable law to place the subject nursing facilities into receivership.

23.    Cause exists under Section 362(d)(1) for relief from the automatic stay of Section 362(a) to permit the "takeover" of the subject facilities for the purpose of establishing receiverships.

24. Other terms of relief originally requested in the Takeover Motion in aid of the State's "takeover" of the subject facilities are appropriate, with the sole exception of a release of Chapter 5 avoidance claims against the State.  A release of such claims under the circumstances placed of the record of these matters represents an inappropriate transfer of potential value from unsecured creditors to the Credit Bidders.

**Assumption and Assignment of Executory Contracts.**

25.    Integral to one of more of the Transfer Motions is the Debtor's proposal to assume and assign certain executory contracts and/or unexpired leases which are vital to the operation of the various nursing facilities that are the subject of the Transfer Motions. Section 365(b)(1) of the Bankruptcy Code codifies the requirements for assuming and assigning an executory contract or unexpired lease of a debtor, to wit:

* * * *

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

17

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

* * * *

(f) . . . (2) The trustee may assign an executory contract or unexpired lease of the debtor only if–

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365 (2007).

26.   As noted at ¶ 34 of the Findings of Fact, the Credit Bidders have each demonstrated adequate assurance of future performance with regard to the Executory Contracts, and they will be responsible for the payment of any cure costs associated with the assumption and assignment of the Executory Contracts.

Based upon the foregoing Findings of Fact and Conclusions of Law, the Court determines that the Transfer Motions should be **GRANTED** to the extent provided herein. The Court shall enter orders forthwith effectuating this determination.

Dated: July 4, 2008                                         BY THE COURT



Albert S. Dabrowski
Chief United States Bankruptcy Judge